UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LINDA GRANT,

|  |  |  |
|---|---|---|
|  | Plaintiff, | DECISION |
|  |  | and |
|  | v. | ORDER |

COUNTY OF ERIE, and                                    12-CV-00651F
ERIE COUNTY YOUTH DETENTION SERVICES,        (**Consent**)

                                    Defendant.
_____


APPEARANCES:            SANDERS & SANDERS
                        Attorneys for Plaintiff
                        HARVEY P. SANDERS, of Counsel
                        401 Maryvale Drive
                        Cheektowaga, New York  14225

                        ALISA LUKASIEWICZ PLLC
                        Attorneys for Defendants
                        ALISA A. LUKASIEWICZ, of Counsel
                        1207 Delaware Ave., Suite 468
                        Buffalo, New York  14209

                        PHILLIPS LYTLE LLP
                        Attorneys for Defendants
                        AMANDA L. LOWE, of Counsel
                        One Canalside
                        125 Main Street
                        Buffalo, New York  14203-2887


## JURISDICTION

On Mach 3, 2014, the parties to this action consented pursuant to 28 U.S.C. §

636(c) to proceed before the undersigned (Dkt. 39).  The matter is presently before the

court on Defendants' motion for summary judgment (Dkt. 80), filed October 2, 2015.

## BACKGROUND

On July 10, 2012, Plaintiff commenced this action against Defendants alleging employment discrimination and retaliation in violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. Defendants to this action include Plaintiff's former employer County of Erie, New York ("County"), and Erie County Youth Defendant Services ("Youth Services") (together, "Defendants"), for which Plaintiff was employed most recently as a Youth Detention Worker ("YDW"). On November 9, 2012, Defendants moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Complaint for failure to state a claim. (Dkt. 11). In a Decision and Order filed January 2, 2013 (Dkt. 20) ("D&O"), District Judge William M. Skretny granted the motion to dismiss, entering judgment in favor of Defendants on January 3, 2013 (Dkt. 21), and closing the case. *Grant v. County of Erie*, 2013 WL 49707 (W.D.N.Y. Jan. 2, 2013). On February 4, 2013, Plaintiff appealed the dismissal (Dkt. 22), to the Second Circuit Court of Appeals. In its mandate dated October 17, 2013 (Dkt. 25), the Second Circuit affirmed the D&O as to the dismissal of the discrimination claim under the ADEA and the retaliation claims under the ADA and the ADEA, but vacated the D&O as to the ADA discrimination claim and all state law claims. *Grant v. County of Erie*, 542 Fed.Appx. 21, 24-25 (2d Cir. Oct. 17, 2013). In particular, the Second Circuit held the district court's reliance in dismissing the Complaint for failure to state a claim on one physician's statement questioning the wisdom of permitting Plaintiff to resume working as a YDW,

2

in light of Plaintiff's age and history of work-related injuries, given that the physician nevertheless found Plaintiff was capable of performing the essential functions of the YDW job. *Id.* at 23-24. In reinstating the state law claims, the Second Circuit held their *sua sponte* dismissal by the district court for failure to file and serve a notice of claim was in error because Plaintiff was denied notice and an opportunity to address the issue. *Id.* at 24. On November 19, 2013, Defendants filed their answer (Dkt. 27).

On October 5, 2015, Defendants filed the instant motion seeking summary judgment (Dkt. 80) ("Defendants' Motion"), attaching the Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Dkt. 80-1) ("Defendants' Memorandum"), and the Statement of Undisputed Material Facts (Dkt. 80-2) ("Defendants' Statement of Facts"). Also filed in support of Defendants' Motion was the Amended Declaration of Alisa A. Lukasiewicz, Esq. (Dkt. 79) ("Lukasiewicz Declaration"), attaching Defendants' exhibits A through 0 (Dkts. 79-1 through 79-15) ("Defendants' Exh(s). __").[1] On November 9, 2015, Plaintiff filed the Declaration of Linda Grant in Opposition to Defendants' Summary Judgment Motion (Dkt. 85) ("Plaintiff's Declaration"), attaching exhibits 1 through 27 (Dkts. 85-1 through 85-27) ("Plaintiff's Exh(s). __"), and separately filing the Memorandum of Law in Opposition to Defendants' Summary Judgment Motion (Dkt. 86) ("Plaintiff's Response"), and the Statement of Facts in Opposition to Defendants' Rule 56 Statement of Facts (Dkt. 87) ("Plaintiff's Statement of Facts"). On November 22, 2015, Defendants filed the Declaration of Alisa A. Likasiewicz, Esq. (Dkt. 88) ("Lukasiewicz Declaration"), attaching exhibits A through C (Dkts. 88-1 through 88-3) ("Defendants' Reply Exh(s). __"), and the

---

[1] Defendants initially filed their summary judgment motion and supporting papers on September 28, 2015 (Dkt. 78), but improperly electronic filing required the re-filing of some of the papers on September 29, 2015 (Dkt. 79), and the rest of the papers on October 2, 2015 (Dkt. 80).

Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment (Dkt. 88-4) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion is DENIED in part and GRANTED in part.

## **FACTS**[2]

Plaintiff Linda Grant ("Plaintiff" or "Grant"), commenced working for Defendants County of Erie ("the County"), and Erie County Youth Detention Services ("Youth Services") (together, "Defendants"), in 1983, and was last employed with Youth Services as a Youth Detention Worker ("YDW"), at the Youth Detention Center ("Detention Center" or "the facility")).  The Detention Center houses both male and female juvenile delinquents, juvenile offenders and, until 2008, children in need of supervision.  Residents of the Detention Center ranged between 8 and 18 years of age. At all times relevant to this action, Plaintiff's supervisor at the Detention Center was Donald Watkins ("Watkins"), who held the highest employment rank at the Detention Center.

As a YDW, Plaintiff was required to transport residents within the facility to and from classes, activities, and meals, and to escort residents to off-site locations such as to Family Court appearances.  Detention Center residents were housed in separate rooms located within three different "pods" with up to 20 children in each pod.  Each pod was designated for the various detention groups, *e.g.*, male juvenile offenders in one pod, and male juvenile delinquents in another pod.  There were three YDWs assigned to each pod for any given YDW work shift.  Because physical altercations between two

---

[2] Taken from the pleadings and motion papers filed in this action.

children or between a child and a staff member occasionally occurred, and children sometimes threatened to harm themselves or others, YDWs were trained as to various techniques to subdue unruly children.  If an altercation or incident required physical intervention by YDWs, however, YDWs were not permitted to physically intervene unless there was sufficient staff available to safely do so.  Accordingly, if a fight broke out, or if a child threatened harm, all available staff would be called to intervene and generally within moments of the request staff would arrive from other parts of the Detention Center including, *inter alia*, from other pods, the nurses' station, and administration, to assist with physically restraining the combative resident.  All YDWs received training on proper restraint techniques prior to commencing employment at the Detention Center and Plaintiff had received training to instruct other YDWs on proper restrained techniques.  Plaintiff estimates that at most, she was required to physically restrain a resident once a month.  Plaintiff's Declaration ¶ 69.

Twice during her tenure at the Detention Center, Plaintiff injured her non-dominant left hand[3] while restraining a child, with the first injury occurring in 2005 ("the earlier injury"), when Plaintiff was assisting with a "two-man takedown" of a combative resident who was refusing to comply with Detention Center orders.  Plaintiff's Dep. Tr.[4] at 61-64.  With regard to the earlier injury, Plaintiff maintains she was not injured by the resident she was assisting in restraining but, rather, sustained the earlier injury when

---

[3] While working as a YDW, Plaintiff sustained other work-related injuries to her hands and wrists requiring surgical intervention and physical therapy resulting in Plaintiff's temporary disability from work for which Plaintiff received Worker's Compensation, including right wrist and thumb injuries sustained on September 13, 2006, while restraining a disrespectful youth (Dkt. 79-13 at 16), fracture of the right scaphoid (bone in wrist) in 2007, *id.*, and DeQuervain's tensynovitis of the right hand (affecting tendons on thumb side of the wrist), in 2007, for which first dorsal compartment release of the right wrist was performed on August 22, 2007.  *Id.* at 16-17.

[4] References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition, filed as Plaintiff's Ehx. 1.

she hit her left hand on a table in the process of "going down to the floor," fracturing the 3rd metacarpal bone in her left hand. *Id.* at 64. The injury was not painful and Plaintiff, who was able to restrain the combative resident despite the injury, did not realize she had broken a bone until after the resident was restrained and Plaintiff noticed her hand was swollen. *Id.* at 65. Although Plaintiff underwent surgery for the broken bone, and received physical therapy, the earlier injury resulted in some permanent damage to Plaintiff's left hand, with Plaintiff unable to completely close her left hand to make a fist, yet Plaintiff was cleared to return to work and was able to perform all her job duties as a YDW.

The second, more recent injury occurred on February 17, 2008[5] ("the recent injury"), when Plaintiff and other YDWs were performing a controlled takedown while restraining a combative child during which Plaintiff fractured the 5th metacarpal bone in her left hand. Plaintiff did not realize she had injured her left hand until after the child was restrained, and finished working the rest of her shift before having her hand checked at the hospital where it was determined Plaintiff had broken her hand. Plaintiff underwent surgical reduction and K-wire fixation (pin) which was removed on August 15, 2008, when the fracture had healed. Treatment for Plaintiff's recent injury was provided by Dale R. Wheeler, M.D. ("Dr. Wheeler"), of the Hand Center of Western New York ("the Hand Center"). Plaintiff also received extensive physical therapy after the surgery for the injury. Following treatment for the recent injury, Plaintiff was able to close her left hand to the same extent as after treatment for the earlier injury. While out

---

[5] Plaintiff's recent injury is variably referred to as having occurred on February 7, 2008, and February 17, 2008, with no explanation for the discrepancy which is largely insignificant to resolution of Defendants' summary judgment motion.

from work on disability for the recent injury, Plaintiff received Workers' Compensation benefits from February 17, 2008 through November 17, 2008.

At the request of the Workers' Compensation Administration, on November 4, 2008, Plaintiff, whose Workers' Compensation benefits were about to expire, underwent a Fitness for Duty examination by Robert Durning, M.D. ("Dr. Durning"), with Superior Medical Consultants ("SMC"), the County's third-party Workers' Compensation independent medical examiners. Dr. Durning determined Plaintiff was no longer disabled by the recent injury and could return to "unrestricted work activity with the injured left hand." Dr. Durning Report.[6] On November 17, 2008, Plaintiff was cleared to return to work with full duties by Dr. Wheeler, Dr. Wheeler Report,[7] but did not then do so.[8]

By letter to Plaintiff dated November 25, 2008, Erie County Personnel Supervisor Joseph P. Dobies ("Dobies") ("Dobies's Letter"),[9] advised that Plaintiff's failure to return to work after Dr. Wheeler cleared Plaintiff to do so without any restrictions rendered Plaintiff in violation of Erie County Work Rule Group A, Number 12 and subject to discipline including immediate discharge if Plaintiff did not return to work by December 1, 2008. Plaintiff was also advised to contact Emily Kaznica ("Kaznica"), Executive Director of Erie County Office for the Disabled, if she believed she was qualified for a reasonable accommodation. *Id.*

On December 1, 2008, Plaintiff submitted to Watkins, her supervisor, a form titled Requests for Reasonable Accommodations under the ADA ("Accommodations

---

[6] Plaintiff's Exh. 8; Defendants' Exh. M at 11-12.
[7] Plaintiff's Exh. 9; Defendants' Exh. M at 6.
[8] The record is devoid of any explanation for Plaintiff's failure to return to work after being cleared to do so by Dr. Wheeler.
[9] Defendants' Exh. O at 2.

Request"),[10] stating she was requesting as an accommodation of her "hand injury" an additional leave of absence until January 31, 2009, the date to which Plaintiff's primary care physician ("PCP"), Dana Drummond, M.D. ("Dr. Drummond"), had continued Plaintiff as temporarily totally disabled.  In making the Accommodations Request, Plaintiff indicated that although her hand surgeon, Dr. Wheeler, had released Plaintiff to return to work on November 17, 2008, Plaintiff's PCP recommended Plaintiff remain off work until January 31, 2008.  Plaintiff is described by Watkins as having "elected to stay out longer."  In a letter to Plaintiff dated December 1, 2008 ("December 1, 2008 Letter"),[11] Kaznica memorialized her conversation with Plaintiff earlier that day in which Plaintiff inquired about a reasonable accommodation under the ADA and NYSHRL, requesting Plaintiff provide medical documentation to assist Defendants with determining whether an accommodation could be provided.  Enclosed with the December 1, 2008 Letter was the Physician Medical Certification for Request for Reasonable Accommodation forms ("Physician Certification"), to be completed by Plaintiff's physicians and returned by December 21, 2008.

On a Physician Certification completed on December 3, 2008 by Dr. Drummond, Plaintiff's PCP ("Dr. Drummond's Certification"),[12] Plaintiff was not cleared to return to work but, instead, was reported as having limited use of her left hand, was "presently disabled," the duration for such disability was "undetermined," and no accommodations were recommended.  Dr. Drummond separately stated Plaintiff was to remain off work through December 19, 2008.[13]  On a separate Physician Certification completed on

---

[10] Defendants' Exh. O at 4-5.
[11] Defendants' Exh. O at 3.
[12] Plaintiff's Exh. 19; Defendants' Exh. M at 2-3.
[13] Defendants' Exh. M at 7.

December 3, 2008, by Dr. Wheeler ("Dr. Wheeler's Certification"),[14] Plaintiff was reported as having a limitation with fine grasp with her left hand resulting from her left hand fracture, but although such limitation was considered permanent, Plaintiff was not limited in her ability to work and could perform her job without any work restrictions, referencing his November 17, 2008 report.

By letter to Plaintiff dated December 9, 2008 ("December 9, 2008 Letter"),[15] Kaznica advised Plaintiff that based on Dr. Drummond's Certification, Dr. Wheeler's Certification, and the Request for Accommodation, the County was unable to provide any reasonable accommodation that would allow Plaintiff to perform the essential functions of her YDW position. As such, Plaintiff's case regarding her accommodation request was to be closed. Enclosed with the December 9, 2008 Letter was another Physician's Certification to be completed by Plaintiff's physician and returned to the Office for the Disabled if Plaintiff's medical condition improved.

On December 18, 2008, Dr. Drummond examined Plaintiff and updated Plaintiff's disability status, indicating Plaintiff remained totally temporarily disabled through January 31, 2009.[16]

On January 15, 2009, Watkins recommended Plaintiff's Accommodations Request be approved, but the Accommodations Request was denied that same day by the County's Appointing Officer.[17] By letter to Plaintiff dated January 16, 2009 ("January 16, 2009 Letter"),[18] Joseph P. Dobies ("Dobies"), Erie County Personnel Supervisor,

---

[14] Defendants' Exh. M. at 4-5.
[15] Defendants' Exh. O at 6.
[16] Defendants' Exh. M at 8.
[17] The Appointing Officer's signature on the Accommodations Request is illegible and the record does not otherwise identify this person.
[18] Defendants' Exh. O at 7.

advised Plaintiff that her leave of absence without pay, pursuant to which Plaintiff had been out of work since February 10, 2008, was set to expire on February 10, 2009, according to Rule XVIII of the Rules for the Classified Civil Service of the County of Erie, which limits leave of absence without pay to one year. Plaintiff was further advised that if she required additional time off, Plaintiff should contact Kaznica who would determine whether such additional time off would be considered a reasonable accommodation under the ADA, but that Plaintiff's failure to return to work would result in her termination from her YDW position, following which Plaintiff could request a reinstatement when she became physically able to return to work.

On February 12, 2009, Dr. Drummond completed another Physician's Certification form ("Dr. Drummond's Second Certification"),[19] indicating Plaintiff remained unable to close her left hand to make a fist, that Plaintiff was limited in her ability to work insofar as Plaintiff could not lift, grasp or carry, or restrain or transfer residents, and that the limitations were expected to continue for an indefinite period of time, but that Plaintiff could work with accommodations, including work limited to writing, filing, answering the telephone, and driving with her right hand.

By letter to Plaintiff dated February 23, 2009 ("Termination Letter"),[20] Kaznica advised she was in receipt of Dr. Drummond's Second Certification which established Plaintiff was unable to perform the essential functions of the YDW job with any reasonable accommodation. Kaznica also observed Plaintiff had been on leave without pay since February 18, 2009. Because granting Plaintiff additional leave without pay for an indefinite period of time would not be reasonable, Plaintiff would not be granted a

---

[19] Defendants' Exh. M. at 9-10.
[20] Defendants' Exh. O at 8.

reasonable accommodation and her case was closed. Plaintiff's employment with the County was terminated on February 24, 2009.

On October 8, 2009, Plaintiff was examined by Dr. Drummond who cleared Plaintiff to return to work without any restrictions, and Plaintiff provided the report to the County. Despite being cleared to return to work by her PCP, the County required Plaintiff to undergo a Fitness for Duty evaluation performed on December 9, 2009, by orthopedic surgeon Marc Bergeron, M.D. ("Dr. Bergeron"), with SMC, Defendants' Workers' Compensation medical consultants. Dr. Bergeron reported that "[t]he main concern of the claimant is persistent symptoms of the left hand." Dr. Bergeron's Report[21] at 1. Dr. Bergeron recounted the history of Plaintiff's work-related injuries as multiple injuries to her wrists and hands including a non-displaced fracture of her right scaphoid, Dequervain's tenosynovitis of the right wrist treated with a surgical procedure, fracture of the 3rd and then 5th metacarpal of her left hand, noting the last incurred injury to be the one sustained in February 2008, following which Plaintiff had not returned to work. *Id.* According to Dr. Bergeron, despite surgery and "extensive physical therapy," Plaintiff's lingering left hand problems prevented Plaintiff's return to her YDW job, with Plaintiff reportedly not confident she would be able to "immobilize unruly youth" who could be the size of adults, such that Plaintiff would be unable to perform the most demanding part of her work *i.e.*, protecting herself and others. *Id.* Plaintiff also reported feeling there was a risk of reinjuring her left wrist and hand. *Id.* Although Dr. Bergeron's review of the YDW job description established Plaintiff was required to maintain order and discipline, enforce rules and regulations, and to be "physically capable of performing the essential functions of the position without a reasonable

---

[21] Defendants' Exh. M at 14-19.

accommodation," there was "no mention of actually how physically demanding the job is." *Id.* at 3. Dr. Bergeron reviewed more than 200 pages of Plaintiff's medical history, *id.* at 3-5, and, based on his medical history review and physical examination of Plaintiff, diagnosed Plaintiff with healed right scaphoid fracture, status post Dequervain's release, right wrist with good results, and status post open reduction and total fixation, left hand third metacarpal fracture and treatment of fifth metacarpal fracture for which the last surgical procedure was more than one year ago. *Id.* at 5. Dr. Bergeron found Plaintiff's left grip strength at only 50% of her right grip strength. *Id.* Addressing whether Plaintiff was fit for duty, Dr. Bergeron wrote

> This is obviously difficult to answer owing to the nature of her work. The most demanding part is to be able to restrain youth that can be large in stature. Purely, a mechanical point of view, from an orthopedic stand point, it is my view that she could return to her regular work, she is right handed; she would be able to defend herself.
>
> Whether this is reasonable, at her age, there are many other factors that need to be included. She is obviously at increased risk of significant injury with any restraint maneuver. That alone, in my opinion, would preclude her from doing that type of work at age 59 and with a history of multiple problems with her wrists and hands, and 3 fractures. Thus, overall it is my opinion that it is not appropriate for her to return her to full duty without restriction at [*sic*] the type of work where she would have to restrain physically strong people. The risk of re-injury, in my opinion, is unduly high. Otherwise, it is my opinion there is very little disability left from the multiple injuries, and that she has overall good function of her right and left upper extremities except for slightly decreased range of motion of the digits and wrists on the left, and some weakness.
>
> It is my opinion that the level of disability, to give a point of reference, would be best stated at [*sic*] permanent and in between minimal and mild based on this examination.

*Id.*

Although Dr. Bergeron references the physical requirements of Plaintiff's YDW job,

Plaintiff denies having provided Dr. Bergeron with the job description such that Plaintiff

found "curious" Dr. Bergeron's concern over the physical demands of the YDW position. Plaintiff's Declaration ¶¶ 109-14.

By letter dated February 19, 2010 ("February 19, 2010 Letter"),[22] Susan V. Sizemore ("Sizemore"), Executive Director of Erie County Office for the Disabled[23] advised Plaintiff that based on Dr. Bergeron's Report and the fact that Plaintiff had separated from service, no reasonable accommodation was warranted and Plaintiff's case would remain closed.

On July 16, 2010, Plaintiff filed an administrative complaint ("Administrative Complaint"),[24] with the New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC"), alleging employment discrimination based on age and perceived disability under the ADA, the ADEA, and NYSHRL, asserting that she had "promptly and effectively returned to work" following each of her previous work-related injuries, but that although it had "been nearly two years" since she had been cleared by her physicians as physically able to return to work with no restrictions limiting her ability to work as a YDW with the County, she had not been allowed to do so. On June 28, 2010, the EEOC issued Plaintiff a Notice of Right to Sue ("Right to Sue Notice").[25] This action followed.

---

[22] Plaintiff's Exh. 12.
[23] Sizemore became the Executive Director of Erie County Office for the Disabled following Kaznica's retirement from the position.
[24] Defendants' Exh. B at 2-3, and Complaint Exh. A.
[25] Defendants' Exh. B at 4-5; Complaint Exh. B.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where ""'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In the instant case, Plaintiff specifically claims that Defendants, in violation of the ADA, the ADEA, and NYSHRL, discriminated against Plaintiff with regard to her employment, and also retaliated against Plaintiff for complaining about the alleged employment discrimination.  Although Judge Skretny, in the D&O, dismissed all claims for relief for failure to state a claim, all claims but those alleging retaliation were reinstated by the Second Circuit.  Defendants now move for summary judgment on the reinstated employment discrimination claims asserted under the ADA, the ADEA, and NYSHRL.

In support of summary judgment, Defendants argue Plaintiff cannot establish a *prima facie* case of employment discrimination under the ADA, Defendants'

Memorandum at 5-11; the termination of Plaintiff's employment with the County was for the legitimate, non-discriminatory reason that Plaintiff's injured left hand rendered Plaintiff unable to defend herself and co-workers from unruly residents of the Detention Center, which is an essential function of the YDW job, *id.* at 11-12; Plaintiff's failure to timely file a notice of claim pursuant to N.Y. County Law § 52 requires dismissal of all claims under the NYSHRL, *id.* at 12; and Plaintiff has failed to establish the elements of an age discrimination claim under the ADEA. *Id.* at 12-13. In opposing summary judgment, Plaintiff argues she has established a *prima facie* case of employment discrimination under the ADA insofar as Defendants regarded Plaintiff as being disabled in performing the major life activity of working, Plaintiff's Response at 5-17; Defendants chose not to allow Plaintiff to return to work because Defendants did not want to be required to accommodate Plaintiff's disability, *id.* at 17-20; and Defendants have not moved for summary judgment with regard to Plaintiff's failure to accommodate claim because Defendants failed to engage in the interactive process as required. *Id.* at 21-25. In further support of summary judgment, Defendants reiterated that even assuming, *arguendo*, Plaintiff could establish a *prima facie* case of discrimination under the ADA, Plaintiff's employment was terminated for a legitimate, nondiscriminatory reason, *i.e.*, Plaintiff's "compromised" condition presented a safety threat to Plaintiff and others for which no accommodation would be reasonable, Defendants' Reply at 2-6; the County did not discriminate in determining Plaintiff could not perform the essential functions of her YDW job, *id.* at 6-9, the County's actions complied with applicable County policy and all relevant legal requirements, *id.* at 9-10; all state law claims must be dismissed for failure to timely serve a notice of claim, *id.* at 10; and Plaintiff's failure to raise any

issue of material fact suggesting her employment was terminated because of her age requires dismissal of the ADEA claim. *Id.*

2.    **ADA**

"The ADA prohibits discrimination against a 'qualified individual on the basis of disability' in the 'terms, conditions, and privileges of employment.'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting 42 U.S.C. § 12112(a)).  Insofar as the ADA was amended by the ADAAA, the ADAAA is not to be retroactively applied to conduct preceding its effective date of January 1, 2009. *Price v. City of New York*, 558 Fed.Appx. 119, 121 (2d Cir. Mar. 14, 2014) (declining to apply "substantially limits" standard under ADAAA to conduct occurring in 2008 "[b]ecause the ADAAA was not retroactively applicable . . . ."); *Ragusa v. Malverne Union Free School Dist.*, 381 Fed.Appx. 85, 87 n. 2 (2d Cir. June 21, 2010) (applying the version of the ADA in effect during the time at issue, which ended with the plaintiff's termination, because the ADAAA does not retroactively apply, and citing cases); *Young v. Precision Metal Products, Inc.*, 599 F.Supp.2d 216, 223 (D.Conn. 2009).

The same three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell-Douglas*"), used to analyze discrimination claims under Title VII is used to analyze discrimination claims under the ADA. *Kovaco v. Rockbestos-Surprenant Cable Corporation*, 834 F.3d 128, 136 (2d Cir. 2016) (analyzing employment discrimination claims under, *inter alia*, the ADA and Title VII "using the now-familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas*. . . .").  In particular, the plaintiff must first establish a *prima facie* case of employment discrimination based on a disability. *Id.*  Upon meeting this *de*

*minimus* burden of establishing a *prima facie* case of employment discrimination, *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 316-17 (2d Cir. 1999) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)), the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the challenged actions. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Once Defendant has asserted a neutral reason for the alleged discriminatory action, "the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination." *Brennan*, 192 F.3d at 317 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)). *See also Bucalo v. Shelter Island Union Free School District*, 691 F.3d 119, 129 (2d Cir. 2012) ("If the defendant satisfies its burden of production, then 'the presumption raised by the prima facie case is rebutted and drops from the case." (internal quotation marks and citation omitted)), and *Terry*, 336 F.3d at 138 ("'to defeat summary judgment, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." (citing *Stern v. Trustees of Columbia*, 131 F.3d 305, 312 (2d Cir. 1997))). "At the final stage, the plaintiff then has 'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision' – a burden that 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Bucalo*, 691 F.3d at 129 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 256 (1981)).

A. *Prima Facie* Case

To establish a *prima facie* case of employment discrimination under the ADA, "a plaintiff must prove that: '(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.'" *Kinneary*, 601 F.3d at 155-56 (quoting *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)). In the instant case, the first element, *i.e.*, that Defendants are covered by the ADA, is not disputed, nor is the termination of Plaintiff from her YDW position challenged as anything other than an adverse employment action. Accordingly, what remains in dispute is the second element, *i.e.*, whether Plaintiff was disabled or perceived as disabled within the meaning of the ADA, as well as the third element, to wit, whether Plaintiff could perform the essential functions of her YDW position with a reasonable accommodation which Defendants failed to provide.

1. **Disabled under the ADA**

The ADA only protects against employment discrimination of a "qualified individual with a disability," 42 U.S.C. § 12112(a), defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See McBride*, 583 F.3d at 96 (discussing substantive standard for an ADA claim). As relevant to the instant case, "disability" is defined under the ADA as

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

19

(B) a record of such impairment; or
(C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).

In the instant case, Plaintiff claims Defendants discriminated against her with regard to her employment in two ways including failing to accommodate or to engage in the interactive process while Plaintiff was partially disabled by the February 17, 2008 injury to her left hand, Plaintiff's Response at 2, and by continuing to regard Plaintiff as disabled after Plaintiff received medical clearance from her PCP to return to work on October 8, 2009. *Id.* Although Plaintiff has conceded that her claims are limited to acts occurring fewer than 300 days prior to filing her Administrative Complaint on July 16, 2010, *i.e.*, September 19, 2009, *id.* at 2, for the approximately three week period between September 19, 2009 and October 8, 2009, the date Plaintiff's primary care physician, Dr. Drummond, cleared Plaintiff to return to work without any restrictions, Plaintiff's claim that she was able to perform the essential functions of her YDW position with a reasonable accommodation, including either an extended period of leave without pay until Plaintiff fully recovered, or a temporary assignment to a light duty position, the request for which Defendants denied, remains temporally viable. *See Hoffman v. Williamsville School Dist.*, 443 Fed.Appx. 647, 649-50 (2d Cir. Oct. 31, 2011) (affirming district court's dismissal of ADA claim for failure to accommodate insofar as claim was filed more than 300 days after the accommodation was denied).

### a. Physical Impairment

Plaintiff argues that between September 19, 2009 and October 8, 2009, when Plaintiff was deemed by Dr. Drummond disabled in her ability to work in a job requiring physical activity involving her hands and wrists, Plaintiff requested a temporary

assignment to a position which required such tasks as writing, filing, answering telephones, and driving, but Defendants refused the request without ever meeting with Plaintiff. Plaintiff's Response at 21-22. Plaintiff further maintain Defendants could have created a YDW position that did not require the need to physically restrain Detention Center residents, Plaintiff's only job restriction at that time, yet Defendants again failed to even speak with Plaintiff about the request. *Id.* at 22.

It is undisputed that Plaintiff sustained a hand injury in February 2008, and that following the injury Plaintiff has had limited use of her left hand, including an inability to fully close her left hand into a fist, or to grasp objects.[26] The ADA's definition of a "qualified individual" as "one who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires,'" *Stevens v. Rite Aid Corporation*, 851 F.3d 224, 229 (2d Cir. 2017) (quoting 42 U.S.C. § 12111(8)), means that "employers may not discriminate against people with disabilities that do not prevent job performance, but when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified." *Id.* As such, "one of the elements of a claim under the ADA is that an employee was 'qualified to perform the essential functions of his job, with or without reasonable accommodation.'" *Id.* (quoting *Sista v. CDC Ixix N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). Accordingly, the first inquiry on Defendants' Motion is whether the ability to restrain unruly Detention Center residents – the only job function Plaintiff

---

[26] Plaintiff maintains, Plaintiff's Response at 8; Plaintiff's Declaration ¶¶ 87-91 , and Defendants do not dispute, that Plaintiff has been unable to fully close her left hand to make a fist since her earlier injury in 2005, such that despite the lingering mild and permanent impairment, Plaintiff's left hand was in the same physical condition as it was immediately preceding the February 2008 injury.

remained unable to perform between September 19, 2009, and October 8, 2009 – was an essential function of Plaintiff's YDW position.

"In evaluating whether a particular job function is 'essential,' this Court considers 'the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions.'" *Stevens*, 851 F.3d 229 (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (additional citation omitted)). "Courts 'must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position,'" *id.* (quoting *Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003)), with no single listed factor dispositive. *Id.* (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)). Furthermore, the determination of whether a job function is essential is a question of fact determined based on "'both the employer's description of a job and how the job is actually performed in practice.'" *Id.* (quoting *McMillan*, 711 F.3d at 126). In the instant case, there exists a material issue of fact as to whether the ability to restrain unruly youths residing at the Detention Center was an essential function of Plaintiff's YDW position.

In particular, Plaintiff submitted in support of summary judgment a copy of the job description for a Youth Detention Worker ("Job Description"),[27] which lists the "Typical Work Activities" as including, *inter alia*, that a YDW "[m]aintains order and discipline and enforces rules and regulations of Secure and Non-Secure facilities." Job Description at 1. Included among "Full Performance Knowledges [*sic*], Skills, Abilities and Personal

---

[27] Plaintiff's Exh. 25.

Characteristics" is being "physically capable of performing the essential functions of the position with or without reasonable accommodation," *id.*, and "physical condition commensurate with the demands of the position." *Id.* at 2. Significantly, nowhere within the Job Description is the ability to physically restrain residents of the Detention Center unequivocally stated. This is consistent with Plaintiff's explanation that YDWs were not permitted to physically restrain Detention Center residents without assistance from other Detention Center employees, which always arrived within a matter of seconds in response to a call requesting assistance through an intercom system and walkie-talkies carried by each YDW to ensure adequate communication. Plaintiff's Declaration ¶¶ 49-58. According to Plaintiff, although all YWDs were trained in restraint techniques, the Detention Center residents always respected Plaintiff, who was never attacked by a resident, and Plaintiff had no problems maintaining order and discipline with the residents. *Id.* ¶¶ 69-65. Plaintiff explains that she did not sustain her hand injuries upon being attacked by any resident but, rather, the injuries were indirectly sustained when she hit her hand on furniture or the floor while assisting with take-downs initiated by other YDWs. *Id.* ¶¶ 73, 82. Furthermore, in responding to Plaintiff's Requests for Admissions,[28] Defendants admitted that another YDW, Jeanette Calendar ("Calendar"), was, on two occasions, specifically from December 31, 2010 to February 18, 2011, and again from August 27, 2012 to October 1, 2012, provided with a reasonable accommodation in the form of a temporary light duty position which did not require Calendar to restrain unruly residents. Requests for Admissions, Request 5.

In contrast to Plaintiff's assertions, Plaintiff's supervisor, Watkins, explains that based on his personal knowledge as the Detention Center's supervisor from 1991 until

---

[28] Plaintiff's Exh. 14.

his retirement in 2014, "the need to restrain the youths residing at the County [Youth Detention] Facility in the event of an episode is without a doubt an essential part of the job." Watkins Declaration[29] ¶¶ 1, 3. Watkins continues that "[m]aintaining discipline and order at the facility is key to ensure the safety of the employees and the children. *This is the most significant component to the job duties of this title*. The ability to not perform adequately presents a direct threat to safety." *Id.* ¶ 3 (italics added). Watkins further explains that situations occur in which a YDW is required to perform a restraint by herself, *id.* ¶ 7, and even when assisted by other YDWs, the performance of a restraint "requires a certain level of physical ability." *Id.* ¶ 8. As such, based on more than 30 years of experience with the Youth Detention Facility, Watkins maintains that "restraining is an essential function of the job. Plaintiff's declaration inaccurately describes the frequency that the need to maintain order occurs." *Id.* Watkins also references Plaintiff's assertion that YDWs were not permitted to physically restrain Detention Center residents without assistance from other Detention Center employees, which always arrived within a matter of seconds in response to a call requesting assistance, asserting that although there were times when the residents were better behaved, "the ability to restrain was always a constant." *Id.* ¶ 9 (citing Plaintiff's Declaration ¶¶ 49-69). The contrasting descriptions of the YDW position given by Plaintiff and Watkins, especially with regard to the need to restrain unruly residents using both hands of a YDW, and in light of the absence of such requirement in the Job Description and that Defendants temporarily exempted at least one other YDW from performing restraints, presents an issue of fact as to whether restraining unruly youth was an essential function of the YDW position.

---

[29] Lukasiewicz Reply Exh. A.

If restraining unruly youths is not an essential function of the YDW position, then Plaintiff must be found able to perform the essential functions of the YDW position without regard to whether Plaintiff required any accommodation of her left hand impairment. On the other hand, if it is ultimately determined that restraining unruly Detention Center residents was an "essential function" of Plaintiff's YDW position, then Plaintiff may be able to establish Defendants discriminated against her in violation of the ADA by "'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Sheng v. M&T Bank Corporation*, 848 F.3d 78, 86 (2d Cir. 2017) (quoting *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. 12112(b)(5)(A))). "A plaintiff makes out a *prima facie* case of disability discrimination arising from a failure to accommodate by showing each of the following:

> (1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

*Id.* (quoting *McBride*, 583 F.3d at 96-97) (internal quotation marks omitted)). In particular, Plaintiff must establish there was a reasonable accommodation that would have permitted Plaintiff to perform the essential job function of restraining unruly youths because "'[a] reasonable accommodation can never involve the elimination of an essential function of a job.'" *Stevens*, 851 F.3d at 230 (quoting *Shannon*, 332 F.3d at 100). Nevertheless, "[a] reasonable accommodation may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities.'" *Id.* (quoting 42 U.S.C. §

12111(9)).  Requiring another employee to perform the essential functions of a disabled worker's job, however, is not a reasonable accommodation under the ADA.  *Id.* at 231.

Although generally where the suggested reasonable accommodation is a transfer to another position, the onus is on the plaintiff to establish she requested, considered and was open to such position, *Stevens*, 851 F.3d at 230-31, in the instant case, Plaintiff maintains, Plaintiff's Response at 24, and Defendants do not dispute, that Plaintiff was not required to request such an accommodation because the County's Transitional Duty Program ("Transitional Duty Program"), requires the County to offer transitional duty to injured employees regardless of whether it is requested by the employee.  Transitional Duty Program[30] at 2.  As relevant here, "[i]f a qualified employee does not request transitional duty work, Erie County will offer such work to the employee, subject to availability of this work. . . . In cases where transitional work is available, it generally will take place within an employee's home department; however, the assignment may take place in another department."  *Id.*  Further, Defendants, in response to Plaintiff's discovery requests, provided a list of 16 accommodations granted to YDWs between 2005 and 2015 including, *inter alia*, a light duty position in Family Court in 2010, a modified sit down job in 2010, a position involving no patient contact, but only paperwork duties and site visits in 2009, and a temporarily modified duty requiring no restraining of residents at the Detention Center in 2009.  YDWs Accommodations.[31]  This evidence of positions which Plaintiff would have been able to perform while restricted from restraining residence pending the completion of healing of her left hand, in the absence of any evidence from Defendants that Plaintiff was offered,

---

[30] Plaintiff's Exh. 16.
[31] Plaintiff's Exh. 26.

and declined, any transitional duty position, establishes a material issue of fact as to whether Defendants failed to accommodate Plaintiff's disability from September 19, 2009, until October 8, 2009 when Dr. Drummond cleared Plaintiff to return to work without restriction.

Summary judgment thus is DENIED as to whether Plaintiff was subjected to employment discrimination in violation of the ADA as an individual with a physical impairment who nevertheless could perform the essential functions of her YDW job with or without a reasonable accommodation.

### b.    Regarded as Having an Impairment

Plaintiff also maintains that after Dr. Drummond, on October 8, 2009, cleared Plaintiff to return to her YDW position without restriction, Defendants failed to do so, despite being eligible under N.Y. Civil Service Law § 71 ("§ 71"), for reinstatement to her prior position for up to four years from the date of her termination, establishes Defendants regarded Plaintiff as having an impairment in violation of the ADA. Plaintiff's Response at 15-16. Defendants have not responded in opposition to this argument, relying instead on their assertion that Plaintiff's employment was terminated for a legitimate, non-discriminatory reason, that is, Plaintiff's physical impairment posed a direct threat to Plaintiff and co-workers insofar as Plaintiff was rendered unable to defend herself and others from physical attack by an unruly Detention Center resident. Defendants' Reply at 7-8.

The ADA, as amended by the ADAAA, provides that,

An individual meets the requirement of "being regarded as having such an impairment" [under the ADA] if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or

perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

In other words, the ADAAA

"restores Congress's original intent by making clear that an individual meets the requirement of 'being regarded as having such an impairment' if the individual shows that an action (e.g. disqualification from a job, program, or service) was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits *or is believed* to limit a major life activity."

*Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012) (quoting H.R.Rep. No. 110-730, pt. 1, at 14 (2008) (emphasis added).

As such, Plaintiff need not demonstrate that Defendants regarded her as being substantially limited in a major life activing; rather, Plaintiff was only required to raise a genuine issue of material fact as to whether Defendants regarded Plaintiff as having a physical impairment. *Id.*

After Plaintiff was cleared by her PCP, Dr. Drummond, on October 8, 2009, she no longer had any disability and, as such, no accommodation was required. Significantly, Dr. Bergeron's report, as determined by the Second Circuit, *Grant*, 542 Fed.Appx. at 24, admits Plaintiff could perform the regular duties of her YDW position, and Bergeron's "personal opinion" in which Plaintiff's desire to return to the position is "questioned" given an increased likelihood that Plaintiff would again be injured is nothing more than mere speculation which does not, as a matter of law, support a finding that Plaintiff was not able to perform the essential functions of her job.

Pursuant to § 71, if an employee separates service "by reason of a disability resulting from occupational injury or disease as defined in the workmen's compensation law," the employee is entitled to a one year leave of absence, or two years if the

disability results from an assault sustained in the course of employment. N.Y. Civil Service Law § 71. Following such leave the employee, within one year of the termination of the disability, may apply for a medical examination to be conducted by a medical officer selected by the department to certify the employee's fitness for duty to "be reinstated to his or her former position, if vacant, or to a vacancy in a similar position or a position in a lower grade in the same occupational field, or to a vacant position for which he or she was eligible to transfer." *Id.* In the absence of an appropriate vacancy to which the employee can be reinstated, "the name of such person shall be place upon a preferred list for his or her former position, and he or she shall be eligible for reinstatement from such preferred list *for a period of four years*." *Id.* (italics added). It is significant that Defendants have not replied in further support of summary judgment on this point, nor do Defendants deny that upon being cleared to work without restriction on October 8, 2009, Plaintiff was eligible for reinstatement pursuant to § 71. Rather, Defendants assert only that temporary assignments to another job as a reasonable accommodation must be in accordance with any relevant collective bargaining agreement, and the determination as to whether such a job is available is part of the County's "objective decision-making process. . . ." Defendants' Reply at 6. Defendants do not, however, assert that any attempt was undertaken to determine whether a suitable temporary assignment Plaintiff could perform was available.

Accordingly, there are issues of fact as to whether Plaintiff was entitled to be reinstated to her YDW position pursuant to § 71 upon being cleared to return to work without restriction.

Moreover, Defendants' assertion that Plaintiff's termination was based on Dr. Bergeron's conclusion that Plaintiff's physical condition posed a direct threat to the safety of herself and her co-workers, Defendants' Memorandum at 7-11; Defendants' Reply at 7-8, is not supported by Dr. Bergeron's Report.  In fact, Dr. Bergeron's Report specifically states "[Plaintiff] would be able to defend herself," Dr. Bergeron's Report at 5, and is silent as to Plaintiff's ability to protect co-workers, with no indication that Dr. Bergeron was ever asked to comment on that possibility.  Further Dr. Bergeron himself emphasized that his examination of Plaintiff was only a "Fitness for Duty Evaluation." *Id.* at 5.  Accordingly, the record contains sufficient evidence to avoid summary judgment that Defendants' failure to reinstate Plaintiff pursuant to § 71, to her YDW, or similar, position after being cleared to work without restriction by Dr. Drummond on October 8, 2009, consistent with Dr. Bergeron's determination that Plaintiff could perform the duties of her YDW job, including defending herself, was based on Defendants' perception that Plaintiff is disabled.

Summary judgment on Plaintiff's claim that Defendants failed to reinstate Plaintiff to her YDW position because they wrongly regarded Plaintiff as disabled in violation of the ADA is DENIED.

Plaintiff having established genuine issues of material fact as to whether she has established a *prima facie* case of employment discrimination under the ADA based both on having an impairment, or being regarded as having an impairment, has shifted the burden to Defendants to provide a legitimate, non-discriminatory reason for the termination of Plaintiff's employment.

## B. Legitimate, Non-Discriminatory Reason for Termination

Defendant, in support of summary judgment, attributes the termination of Plaintiff's employment to Plaintiff's inability to protect herself and her co-workers from harm that could be inflicted by an unruly Detention Center resident, Defendants' Memorandum at 7-11; Defendants' Reply at 7-8, and Plaintiff was discharged pursuant to Rule XVII of the Rules for the Classified Civil Service of the County of Erie which provides that a leave without pay shall not exceed one year, with an absence in excess of one year being deemed the equivalent of a resignation. Defendants' Memorandum at 11-12. Plaintiff has not responded to this argument.

Genuine safety concerns have been held to be a legitimate, non-discriminatory reason supporting an adverse employment action under the ADA. *See*, *e.g.*, *Gaines v. N.Y.C. Transit Authority*, 353 Fed.Appx. 509, 510-11 (2d Cir. Nov. 16, 2009) (holding city transit authority's directive prohibiting train operator with bilateral hearing aids from operating trains in designated train yard was motivated by legitimate public safety concerns and, as such, did not constitute unlawful employment discrimination under the ADA). Accordingly, Defendants have stated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and the burden shifts to Plaintiff to establish a material issue of fact exists that could support a finding that such legitimate, non-discriminatory reason is mere pretext for unlawful discrimination.

## C. Pretext for Discrimination

Conclusory allegations unsupported by any evidence that an employer's legitimate, nondiscriminatory reasons for an adverse employment action are mere pretext for discrimination are insufficient to satisfy Plaintiff's burden under Rule 56(e) on

summary judgment. *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (affirming summary judgment where plaintiff presented only affidavit of challenged custom and practice of race discrimination in absence of any evidence that affiant had any connection with relevant department until after plaintiff was terminated (citing *Smith v. American Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988) (affirming summary judgment where plaintiff failed to present more than conclusory, unsupported assertions that employer's proffered race-neutral reason for denying promotion was pretext))). Nevertheless, the Second Circuit has long recognized that direct evidence of employment discrimination or a "smoking gun" is typically not available. *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). As such, that a defendant's legitimate, nondiscriminatory explanation for an adverse employment action is mere pretext for intentional discrimination may be established by circumstantial evidence. *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). Here, Plaintiff has produced sufficient evidence that Defendants' proffered legitimate, nondiscriminatory reason for terminating her employment is mere pretext to disability-based employment discrimination.

In particular, Plaintiff has provided a list of 16 other YDWs who, after sustaining injuries, were permitted either to return to work with no restrictions, or were permitted to return to a modified position, YDWs Accommodations, yet Plaintiff was never offered a similar accommodation despite the Transitional Duty Program requiring the County to do so. Further, Defendants' reliance on Dr. Bergeron's Report as supporting the asserted reason for terminating Plaintiff's employment, *i.e.*, that Plaintiff was unable to defend herself or co-workers, as discussed above, Discussion, *supra*, at 29-30, is

inapposite because Dr. Bergeron specifically found Plaintiff would be able to defend herself, and is silent as to whether Plaintiff would be able to defend others.

As further circumstantial evidence that Defendants' legitimate, nondiscriminatory reason for terminating Plaintiff's employment was mere pretext are inconsistent statements made by Defendants regarding whether Defendants required an injured employee to be fully healed prior to returning to work after a medical leave of absence. Significantly, "[c]ourts have 'consistently found' that such '100% healed' or 'fully healed' policies violate the ADA." *Warmsley v. N.Y. City Transit Auth.*, 308 F.Supp.2d 114, 121-22 (E.D.N.Y. 2004) (citing cases) ("[T]he [defendant], by implementing its 'disability has terminated' policy, required individuals returning from medical leave to be disability-free. Thus, [defendant] regarded every former employee who had taken a medical leave as 'substantially limited' in his ability to work in a broad range of jobs."); *see also Rodriguez v. Atria Sr. Living Group, Inc.*, 887 F.Supp.2d 503, 511 n. 3 (S.D.N.Y. 2012) (noting that a "100% healed" policy prevents individual assessments and therefore violates the ADA). In the instant case, Plaintiff maintains Defendants had an unlawful policy of not returning YDW to work without being fully healed. Plaintiff's Response at 15 (citing Plaintiff's Declaration ¶¶ 145-16). Although Defendants assert they do not have a policy of requiring an injured employee be fully healed in order to return to work, Defendants' Reply at 9 (maintaining whether to return an injured employee to light-duty work based on the employee's restrictions and the availability of suitable work is made on a case-by-case basis), when asked whether the County had a formal or informal policy precluding returning employees to work unless they were cleared for full work duty, Dobies specifically responded, "Yes," and continued, "That was a standard. You

needed clearance to return a hundred percent." Dobies Dep. Tr.[32] at 49. Of still further evidence of pretext is that the Termination Letter does not allude to Plaintiff's inability to defend herself or others as a reason for terminating Plaintiff's employment.

Accordingly, the record contains sufficient evidence upon which a reasonable jury could find that Defendant's legitimate, nondiscriminatory reason, *viz.*, workplace safety, for terminating Plaintiff's employment was mere pretext for disability-based employment discrimination. Summary judgment therefore is DENIED on Plaintiff's ADA claim.

## 3.     ADEA

Although in the Fifth Claim, Plaintiff claims Defendants discriminated against her based on her age, 49, in violation of the ADEA, Complaint ¶¶ 42-44 ("ADEA Claim"), Defendants assert, Defendants' Memorandum at 12-13, Plaintiff has failed to point to any evidence in the record suggesting the termination of Plaintiff's employment was based on Plaintiff's age and Plaintiff, in opposing summary judgment, has not responded to this assertion other than to acknowledged that she has already conceded to the dismissal of her ADEA Claim in its entirety. Plaintiff's Response at 2 (citing D&O at 7). Defendants have not further addressed the ADEA Claim other than to assert "the age discrimination claim can be dismissed." Defendants' Reply at 10.

Because Plaintiff conceded to the dismissal of the ADEA Claim, *see* D&O at 7 (citing Dkt. 16 at 5), and Plaintiff has not provided any argument for reviving such claim, summary judgment is GRANTED as to Plaintiff's ADEA Claim.

---

[32] References to "Dobies Dep. Tr." are to the transcript of the deposition of Dobies, portions of which are filed as Plaintiff's Exh. 6.

### 4. NYSHRL

Plaintiff's Second and Sixth Claims, respectively, allege employment discrimination under the NYSHRL based on disability, Complaint ¶¶ 31-34, and age, *id.* ¶¶ 45- 46 (together, "the state law claims"). In addressing Defendants' earlier motion to dismiss, the state law claims were dismissed, *sua sponte*, based on Plaintiff's failure to timely file a notice of claim to the County, as required by N.Y.County Law § 52. D&O at 11. The Second Circuit reversed the *sua sponte* dismissal of the state law claims because Plaintiff had not been given notice of the ground for dismissal and an opportunity to be heard on this inadequate notice affirmative defense which was not asserted by Defendants. *Grant*, 542 Fed.Appx. at 24. Defendants, who raised Plaintiff's failure to serve the notice of claim as an affirmative defense in their Answer ¶ 16, filed after the Second Circuit's modification of the D&O, now argue in support of summary judgment that Plaintiff's failure to timely serve a notice of claim pursuant to N.Y.County Law § 52 requires dismissal of the state law claims. Defendants' Memorandum at 12. In opposing summary judgment, Plaintiff has not addressed her state law claims other than to acknowledge their reinstatement by the Second Circuit. Plaintiff's Response at 2. In further support of summary judgment, Defendants reiterate that although Plaintiff now been apprised of her failure to timely provide the County with notice of her claims under state law, and provided with an opportunity to oppose dismissal on this ground, she has failed to do so. Defendants' Reply at 10.

Pursuant to N.Y. County Law § 52, prior to commencing an action for damages against the county, the plaintiff must file and serve a notice of claim against the county within 90 days after the claim arises. N.Y. County Law § 52(a). Plaintiff's undisputed

failure to serve the requisite notice, given that the 90-day time period for doing so has long expired, is fatal to her state law claims.  *See Mills v. Monroe County*, 451 N.E.2d 456, (N.Y. 1983) ("When an employment discrimination action is brought against a county under the State . . . statutes, the failure to timely file a notice of claim shall be fatal unless the action has been brought to vindicate a public interest or leave to serve late notice has been granted by the court.").  No argument having been advanced that the instant action has been brought to vindicate a public interest, nor any request for leave to serve late notice having been made to the court, Plaintiff's failure to serve the County with any notice of claim requires dismissal of the state law claims.

Defendants' Motion is GRANTED as to the state law claims.

**5.      Retaliation**

Insofar as Plaintiff asserted retaliation claims under the ADA and NYSHRL, Complaint ¶¶ 35-41, the dismissal of such claims in the D&O, D&O at 11-12, was affirmed by the Second Circuit.  *Grant*, 542 Fed.Appx. at 24.  Accordingly, such claims remain dismissed and are not before the court on summary judgement.

<u>**CONCLUSION**</u>

Based on the foregoing, Defendants' Motion (Dkt. 80) is DENIED in part and GRANTED in part, and the case will be scheduled for trial on Plaintiff's ADA claims. SO ORDERED.

*/s/ Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 18, 2017
            Buffalo, New York